**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO.  05-140 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| GUY JAMAL GANT | : | |

**MEMORANDUM OPINION**

**Savage, J.**                                                                 **July 6, 2005**

The defendant, who is charged in a one count indictment with possession of counterfeit currency, has moved to suppress evidence seized by the police during a traffic stop.  He contends that the police did not have probable cause to stop and search his vehicle.  The government, on the other hand, claims that the evidence was seized after the arresting officer saw suspected drugs in the car during a valid stop for a traffic violation.

Based upon our credibility determination,[1] we find that the police officers did not observe a traffic violation and did not see any suspected contraband before searching the car and the defendant.  We conclude that the traffic violation was fabricated later to validate the illegal stop and search of the car.  It is not a single inconsistency that compels our finding that there was no traffic violation justifying the stop and search of the car and its driver.  It is the number of contradictions and the implausibilities of the officers' testimony that defy credibility.  Accordingly, because there was no other legal justification for stopping the defendant's vehicle, we shall grant the defendant's motion and suppress

---

[1] The tenor of the testimony and the demeanor of the witnesses can only be appreciated by having actually seen and heard the witnesses testify.

1

the evidence seized from the vehicle and the defendant.

After the suppression hearing, we made findings of fact. This memorandum opinion supplements and explains our findings and conclusions.

### Factual Background

Earlier in the evening before they came into contact with the defendant, Policemen Kurt Myers ("Myers") and Michael Winkler ("Winkler") had investigated a radio call reporting a complaint of a Black male in a white Cadillac Escalade exposing himself.[2] Finding no car matching the flash description, they reported the complaint as unfounded.[3] About 45 minutes later and in a different part of the police district, they saw a silver or light grey Cadillac Escalade stopped in the middle of the street with another vehicle behind it.[4] As the police car proceeded down the street, both vehicles moved to the corner and turned left.[5] After making three more left turns, the Cadillac returned to the same block where it had been originally observed by the officers.[6]

As the driver of the Cadillac was parking, the two officers surrounded the car.[7] Myers stood by the passenger door so he could have a clear view of the inside of the car.[8]

---

[2] Suppression Hr'g Tr. at 5-6, 43-44 (May 17, 2005).

[3] *Id.* at 6, 21-22, 44, 59.

[4] *Id.* at 6-7, 58-59.

[5] *Id.* at 36-37.

[6] *Id.* at 9, 38.

[7] *Id.* at 48, 63.

[8] *Id.* at 25-26.

Winkler went to the driver's side near the mirror.[9]  According to Winkler, when the driver opened the center console in response to his request for identification, he shined his flashlight and saw packets of suspected drugs and money inside.[10]  He testified that he leaned over the defendant and reached into the Cadillac, grabbed the evidence, put it in his rear pocket, and handcuffed the driver.[11]  Myers, who had an unobstructed view of the front compartment of the Cadillac, saw nothing like Winkler described.[12]

After the defendant was transported to police headquarters, Myers prepared the necessary police reports and issued a traffic citation charging the defendant with failing to use his left turn signal before he made the first turn.[13]  Winkler supplemented the reports, adding the reason for stopping the car and the results of the search of the car and the defendant's person.[14]

## Discussion

Police may stop a car committing a traffic violation.  *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977); *United States v. Bonner*, 363 F.3d 213, 216 (3d Cir. 2004).  The officer's motivation for making a traffic stop is irrelevant so long as there is probable cause for it.  *Whren v. United States*, 517 U.S. 806, 813 (1996).  In other words, the police may use a traffic violation as a reason for stopping a vehicle suspected of containing

---

[9] *Id*. at 11-12, 48.

[10] *Id*. at 48.

[11] *Id*. at 65-66.

[12] *Id*. at 25-26, 28-29.

[13] *Id*. at 14-17, 34-35.

[14] *Id*. at 56, 73.

contraband where the suspicion does not rise to the level justifying a *Terry* stop.  *United States v. Johnson*, 63 F.3d 242, 247-48 (3d Cir. 1995).  However, the police must have probable cause to believe that a traffic violation had occurred.

An investigatory traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry v. Ohio*, 392 U.S. 1, 20 (1968).  Consequently, the traffic stop must be of limited duration, lasting no longer than is necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.  *Illinois v. Caballas*, __ U.S. __, 125 S. Ct. 834, 837 (2005) (citing *United States v. Jacobsen*, 466 U.S. 109 (1984)).

During an investigatory stop, the police "may exercise reasonable superintendence over the car and its passengers."  *Bonner*, 363 F.3d at 216.  They may order the driver out of the car or order him to remain in the car with his hands up.  *Id.*  The police may also frisk a vehicle's occupants and search the passenger compartment if they have reasonable suspicion that the occupants might be armed and dangerous.  *Michigan v. Long*, 463 U.S. 1032, 1049-50 (1983).

Here there is no question that the police officers had neither a reasonable suspicion nor probable cause to believe that the Cadillac contained contraband or evidence of a crime before stopping it.  Nor did they have reasonable suspicion that the driver was committing a crime.  Indeed, the government does not contend that they did.  Therefore, the only justification for stopping the vehicle was if there was probable cause that a traffic violation had occurred.

Neither officer was in a position to see if the Cadillac's turn signal had been used.

4

There was a car between the Cadillac and the police car in the same narrow lane.[15]  Even if they could have seen the left rear of the Cadillac, we do not believe that they saw the driver fail to use his signal.

Myers testified that he and Winkler had discussed whether they should stop it during the course of following the Cadillac for a few blocks and several turns.[16]  Winkler recalled no such discussion.[17]

The traffic citation was written and issued well after the defendant was arrested and the contraband had been seized.[18]  Significantly, when he prepared the arrest report, Myers did not complete the portions calling for the reason why the vehicle was stopped and what was recovered.[19]  Winkler did.[20]

Even if the defendant had failed to use his turn signal, giving the police probable cause to stop him for a traffic violation, the search exceeded the permissible scope of a car stop.  After stopping a vehicle for a traffic violation, the police may detain the operator only as long as is necessary to process the traffic violation unless there is articulable suspicion of other illegal activity.  *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). While conducting the car stop, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of

---

[15] *Id.* at 7, 36-37, 46.

[16] *Id.* at 38-39.

[17] *Id.* at 71-72.

[18] *Id.* at 13-14, 18-19, 51-52, 65.

[19] *Id.* at 35.

[20] *Id.* at 56-57.

time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).

We do not believe Winkler saw any suspicious objects or suspected drugs inside the car before searching it.  He claimed he observed the drugs when the defendant opened the center console.[21]  He testified that while he was opening the car door, he told Myers that "there were narcotics in there."[22]   Yet, Myers, who was in a position to see clearly in the car, did not testify that he saw anything suspicious.  In fact, he said he did not.[23]  He testified that he did not know any narcotics had been recovered until his partner told him later.[24]

The officers contradicted each other regarding when and where the contraband was found.  Myers, standing where he could see inside the Cadillac, did not observe any drugs in the vehicle.[25]  Winkler claimed he saw the drugs and the money in the center console, which was closer to Myers than Winkler, after the driver opened it to retrieve his driver's information.[26]  Winkler testified he reached across the driver and grabbed the drugs and money which he placed in his rear pocket while placing handcuffs on the driver's left hand.[27]  Myers testified that the driver was not placed into cuffs until after he had exited the

---

[21] *Id.* at 48, 50-51, 64-65.

[22] *Id.* at 51.

[23] *Id.* at 12, 26, 40.

[24] *Id.* at 40-41.

[25] *Id.* at 12, 26.

[26] *Id.* at 48.

[27] *Id.* at 65-66.

car and Myers had come from the other side.[28]

Incredibly, Myers did not know why the driver was placed under arrest.[29] He did not see any drugs nor did he recover any.[30] He only learned later from Winkler that drugs had been recovered.[31] Myers, when he filled out the reports, did not include anything about narcotics having been seized.[32] Winkler added that information in his own handwriting on the forms which Myers had already completed.[33]

The officers also contradicted each other about when the money was taken from the driver's pockets. Myers said it was seized during a pat down search at the traffic stop.[34] Winkler claimed it was while processing at headquarters.[35]

During his testimony, Myers appeared evasive and hesitant, attempting to distance himself from Winkler. Although he was standing only a few feet from the driver and Winkler, he claimed not to have heard any conversation between the two.[36] At first saying that "we recovered everything from the vehicle as he [the driver] was standing outside," Myers retreated, testifying that he did not recover any evidence from the vehicle.[37] He

---

[28] *Id.* at 25, 27.

[29] *Id.* at 40.

[30] *Id.* at 26, 28, 40.

[31] *Id.* at 40-41.

[32] *Id.* at 35.

[33] *Id.* at 56-57.

[34] *Id.* at 18.

[35] *Id.* at 72-74.

[36] *Id.* at 12-13, 25.

[37] *Id.* at 28.

stated that he did not look for anything in the vehicle and could not "testify as to what my partner [Winkler] did," although he was present during the entire incident.[38]

If the traffic stop was legal, when the contraband was discovered is critical. If the police saw it when the defendant opened the console, then its seizure was proper under the plain view exception. *See Minnesota v. Dickerson*, 508 U.S. 366, 374-75 (1993). On the other hand, if the defendant was removed and handcuffed before the vehicle was searched and before the officers had a reasonable, articulable suspicion that it contained contraband or a weapon, the search exceeded the permissible spatial bounds of a legitimate traffic stop even though it did not go beyond the temporal scope. *See United States v. Kithcart*, 218 F.3d 213, 219 (3d Cir. 2000). Of course, if the police had other independent legal bases for searching the car and the defendant during the stop, the action would have been justified. *See United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997). We find that they did not.

We cannot determine exactly when the contraband was taken from the Cadillac or the driver. However, we do find that it was not while the defendant was in the vehicle, contrary to when Winkler said it was. Myers had a clear view of the interior of the car the whole time the defendant occupied it.[39] Yet, he did not see Winkler lean into it and retrieve anything.[40] He disclaimed any knowledge of where the drugs had been seized.[41] In light of Myers' testimony, we conclude that the contraband was found and seized after the

---

[38] *Id.*

[39] *Id.* at 26.

[40] *Id.* at 12-13, 26.

[41] *Id.* at 40.

defendant was outside the car and in handcuffs.

The search of the interior of the Cadillac and the defendant cannot be justified as incident to an arrest.  The police officers had neither a reasonable suspicion nor probable cause that the car contained contraband or evidence of a crime.  Furthermore, there was no reasonable suspicion that the defendant was committing a crime or that he had a weapon.  In short, there was no predicate for legally searching the Cadillac or the defendant.

Many of the inconsistencies relate to conduct occurring after the traffic stop and after the point of the probable cause determination.  Nevertheless, they reflect upon the credibility of the officers' entire testimony.  Looking at the testimony as a whole after having had the opportunity to observe the demeanor of the witnesses, we conclude that the officers did not observe any traffic violation.  Therefore, in the absence of any other justification for stopping the Cadillac, we find that the stop was illegal and any evidence derived from it must be suppressed.

_____

TIMOTHY J. SAVAGE, J.